**UNITED STATES of America**

v.

**Johnny B. SAMPLE, Jr., a/k/a John B. Sample, Jr.**

**Crim. A. No. 71–575.**

United States District Court, E. D. Pennsylvania.

May 29, 1974.

As Amended June 10, 1974.

Gary Tilles, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Frederick R. Herman, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Following a jury verdict of guilty on ten counts of an indictment charging uttering U. S. Treasury checks with forged endorsements [1] and possession of stolen mail,[2] the defendant John B. Sample, Jr. was sentenced on March 19, 1973 to a suspended sentence with a probation term of three (3) years on each count.[3] A condition of defendant's probation was that he refrain from violation of any law.[4] Upon motion of the government averring that the defendant had violated his probation, we issued a warrant for defendant's arrest on February 27, 1974, and defendant was arrested on that date. The government in its motion

---

1. In violation of 18 U.S.C. § 495 (1970).

2. In violation of 18 U.S.C. § 1708 (1970).

3. A fine of $1000 was also imposed on Count 1. Only $75 of this fine has been paid by the defendant. We do not consider this factor, however, in determining whether probation should be revoked since the government did not give notice of nonpayment as a grounds for probation revocation.

4. Other conditions of probation were:
   (1) You shall refrain from violation of any law (federal, state, and local). You shall get in touch immediately with your probation officer if arrested or questioned by a law-enforcement officer.
   (2) You shall associate only with law-abiding persons and maintain reasonable hours.
   (3) You shall work regularly at a lawful occupation and support your legal dependents, if any, to the best of your ability. When out of work you shall notify your probation officer at once. You shall consult him prior to job changes.
   (4) You shall not leave the judicial district without permission of the probation officer.
   (5) You shall notify your probation officer immediately of any change in your place of residence.
   (6) You shall follow the probation officer's instructions and advice.
   (7) You shall report to the probation officer as directed.

to revoke probation charged the defendant with "fencing" U. S. Treasury checks which had been stolen from the U. S. mail, i. e. possession of stolen checks and causing such checks to be forged and negotiated.

On February 27, 1974, we held a hearing to determine whether the defendant should be admitted to bail. In a separate memorandum filed March 1, 1974, we stated our reasons for denial of bail.

On March 1, 1974, we held a hearing to determine whether probable cause existed to find that the defendant violated the conditions of his probation. 378 F. Supp. 43. See Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). At the conclusion of this hearing, at which the defendant testified, we determined that probable cause existed to find that the defendant had violated the conditions of his probation.

A seven-day final violation of probation hearing was held from March 26, 1974 to April 4, 1974. Considerable evidence was introduced by both parties. Throughout all of these proceedings the defendant was represented by counsel. See Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

In support of its motion for revocation⋅ of probation, the government sought to prove that the defendant had received approximately seventeen stolen Treasury checks knowing them to be stolen, and had caused these checks to be cashed through a bank savings account established by a Gregory Van Appline solely for the purpose of providing a method for cashing the checks. The government's evidence consisted primarily of the testimony of the two persons, Melvin Grover (also known as "Skeeter") and Clarence Jones (also known as "Bonehead"), involved in the breaking into of a United States mail box and the taking of the Treasury checks. The defendant was alleged to have made partial payment to Grover and Jones on the checks by cashing a check of the Parkside Tennis Club, of which the defendant was president, and giving $250 to Grover. Additional evidence incriminating the defendant consisted of the secretive taping of a conversation between the defendant and Grover on January 21, 1974. A surveillance device was placed on Grover's person during the conversation at the defendant's home. Other government evidence sought to corroborate the direct evidence offered by Jones, Grover and the tape recording. This evidence included the opinion of a voiceprint expert that the voice on the tape recording made January 21 was that of the defendant. The expert's opinion was based on spectrograms made from the January 21 tape recording and a known recording of the defendant's voice.

The defendant denied receiving any checks from Grover or Jones. The defendant did acknowledge that he offered to pay Grover money from the Parkside Tennis Club check. But this offer, which the defendant contended was never consummated, was for the purpose of payment towards securing the Delphonics musical group for a cabaret event planned by the Parkside Tennis Club for June, 1973. It was the defendant's evidence that Grover represented to Sample that Grover could obtain the Delphonics for the cabaret event at a price of $900. In addition, the defendant offered the testimony of six witnesses who stated that the defendant was not at home when the January 21, 1974, tape recording allegedly was made, but was at the Philadelphia Spectrum watching tennis matches from approximately 9 A.M. until 11 P.M. on January 21. Other defense evidence sought to discredit the government's witnesses.

Based on the evidence presented by the parties, we make the following findings of fact:

## FINDINGS OF FACT

Clarence Jones, also known as "Bonehead", broke into a mail storage box located at 22nd and Christian Streets, Philadelphia, on March 19, 1973. Among the mail taken from the mail storage box were approximately twenty

(20) United States Treasury checks and an uncertain number of Department of Public Assistance (DPA) checks. Jones took the mail to his home at 760 S. Harshaw Street where he and Melvin Grover, also known as "Skeeter", sorted it in the presence of Jones' wife, Sandra Jones.

The DPA checks were sold to various persons and businesses. Jones and Grover encountered difficulty, however, in finding a person to purchase the Treasury checks.

In the presence of Jones and Jones' wife, Grover called the defendant on March 20, 1973, at the defendant's ticket agency on South 52nd Street. Following the call Jones and Grover went to the defendant's ticket agency. They offered to sell the defendant the Treasury checks. The defendant offered Grover and Jones one-third of the face value of the checks, but refused to pay Grover and Jones for the checks until they had been put through a bank account which process would take two weeks. Grover and Jones declined the defendant's offer and attempted to find another buyer for the checks.

Unable to find another buyer for the checks, Grover and Jones returned to the defendant's ticket agency on March 21, 1973. They left approximately 17 of the checks with the defendant with the understanding that the defendant would provide payment in the near future.

Jones and Grover returned to the ticket agency again on March 22, 1973, seeking cash from the proceeds of the checks in order to pursue their drug habit. The defendant indicated he could give them some cash now; he was waiting for his wife to bring a check. Mrs. Sample soon arrived with a Parkside Tennis Club check. The defendant asked Grover if he had any identification. Grover produced identification in the name of James Hamilton and the Parkside Tennis Club check was then made payable to a James Hamilton.

The Parkside Tennis Club check required the signatures of three club officers. The signature of Frank Blair, Treasurer, had already been obtained. The defendant as president of the club signed the check. The defendant and Grover then proceeded to the Fidelity Bank branch at 353 S. 24th Street. They approached Patricia Collins who was Secretary of the Parkside Tennis Club and a teller at the bank.

The defendant represented Grover to Collins as someone associated with the Delphonics. She envisioned a person associated with such a successful musical group as being more presentable than Grover. Collins thought Grover looked like a "junky". Nevertheless Collins signed the check and cashed it. She handed the $450 to Grover who gave the money to the defendant after leaving the bank. The defendant gave $250 of the money to Grover, and they then returned to the ticket agency where Grover rejoined Jones. Grover and Jones then split the $250.

The defendant's testimony that he thought Grover could obtain the Delphonics for $900 and that Grover had so represented is not credible. Grover never represented that he could obtain the Delphonics. George Franklin was a close friend of the defendant, and had been a "road runner" for the Delphonics. Franklin was more influential than anyone defendant knew in obtaining the Delphonics for the cabaret event. The defendant's testimony that he did not know George Franklin had been a "road runner" for the Delphonics and could be influential in obtaining a booking of the group at a reduced price is not credible.

There is no evidence as to how the checks the defendant received from Grover and Jones left the defendant's possession. The same check eventually, however, came into the possession of Gregory Van Appline. Appline opened an account at the First Pennsylvania Bank on March 28, 1973, with a cash deposit of $15. In quick succession deposits of the checks received by Sample from Grover and Jones were made by Appline or unknown persons at several different branches on three separate

days and three cash withdrawals were made on three separate days.

Clarence Jones was arrested on March 26, 1973, following another mail box robbery and was incarcerated at the Detention Center until bail was raised on May 10, 1973. On at least two occasions Jones made telephone calls from the Detention Center to the defendant's ticket agency for the purpose of seeking bail money. On at least one occasion he spoke with the defendant.

In mid-April 1973, Grover was arrested on unrelated charges and incarcerated at the Detention Center. On at least one occasion Grover spoke to the defendant on the telephone from prison for the purpose of obtaining bail money.

After his release on bail Jones and his wife visited the defendant at his ticket agency to inquire about the failure of defendant to help Jones make bail. Jones was upset that he had not received more of the proceeds from the checks Jones and Grover had given the defendant as the defendant had promised. The defendant informed Jones that the deal had fallen through and that Jones would receive no more money. The defendant then displayed a pistol. Jones and the defendant argued and a friend of the defendant, Charles Fitzgerald, stood between them. Jones and his wife then left.

The defendant's testimony that Jones was in the ticket agency only to borrow money, which the defendant refused him, is not credible. The defendant's testimony that he did not know Jones but that Jones merely walked in off the street to borrow money is not deserving of belief.

The defendant's testimony that Grover learned of the desire to engage the Delphonics by his overhearing a conversation to that effect at the defendant's ticket agency is not believable.

The defendant did attend the tennis matches at the Spectrum on January 21, 1974, but left in mid-afternoon. He arrived at his home at 6121 Cobbs Creek Parkway at 4 P.M. At approximately 4:15 P.M. to 4:35 P.M. Grover met with the defendant inside his residence. Grover and the defendant held a conversation which was transmitted by a device on Grover's person and received and recorded by federal agents on tape. The recording device was placed on Grover's person with his consent.

The taped conversation is incriminating in that it clearly demonstrates that the defendant did receive stolen checks from Grover knowing them to be stolen. The taped conversation also evidences threats by the defendant in order to prevent Jones from providing the government with evidence.

The voice on the tape recording represented as the voice of the defendant is the voice of the defendant as testified to by Grover. The voiceprint expert's identification of the voice as that of a known recording of the defendant's voice is corrobative of Grover's testimony. In addition, this court is familiar with the defendant's voice as a result of the original trial during which defendant testified and as a result of the defendant's testimony during this hearing. Based upon our familiarity with the defendant's voice, we are satisfied that the voice on the tape recording made January 21, 1974, is the defendant's voice.

Testimony of the defendant's witnesses that the defendant was at the Spectrum all day on January 21, 1974, is not believable. Eugene Britchkow was the VIP parking lot attendant at the Spectrum on January 21, 1974. Britchkow testified that he opened the chain to the parking lot to let the defendant's car in about 9:30 A.M. on January 21, 1974. Britchkow then testified that he was in the parking lot until relieved at 5:15 P.M. except for a few excursions into the Spectrum building to go to the men's room and to get lunch. He further testified that the defendant's car never left the parking lot and that he and the defendant had a hot dog together about 3:30 P.M. Mr. Britchkow simply did not tell the truth. Britchkow's testimony that he constantly viewed the defendant's car in the parking lot contradicts

his other testimony that on a number of occasions he walked completely around the inside of the Spectrum building including walking up into a number of the stadium's sections. But yet he testified that the defendant's car never left his view for more than a few minutes. Britchkow testified that he spent most of his time in the parking lot and not in the small house provided for him in a corner of the parking lot. In fact, he stated he was leaning against the defendant's car around the time the government contends the defendant must have left the Spectrum. Furthermore, Britchkow testified that he did not wear a raincoat on January 21. But yet it rained nearly all day January 21 including the time he was leaning against the defendant's car in the open lot. Britchkow's testimony clearly is not worthy of belief.

Lena Lee is a member of the Parkside Tennis Club. She testified at the probable cause hearing as to the precise times she had arrived and left the Spectrum during the week of the tennis matches starting January 21, 1974. We were amazed at her ability to recall the precise times down to the exact minute. At the final revocation hearing she was unable to recall any of the times except the times for Monday, January 21, 1974. Her testimony is suspect.

The testimony of the other defense witnesses with regard to the defendant's presence during the entire day at the January 21 tennis matches is a result of confusion, faulty memory or misstatements.

Defense witness Lavon Miller's testimony is not credible. Miller testified that while he was with Grover on one occasion "shooting-up" heroin at the Brierhurst Hotel in West Philadelphia, a white man and a white woman entered the room Miller and Grover occupied. Miller said that these persons were carrying tape recording devices, and that they and Grover fabricated a conversation involving the transfer of stolen government checks. Miller's implication was that this fabricated tape recording was the same recording the government represents as the conversation between Grover and the defendant that took place at the defendant's home on January 21, 1974. The testimony is not deserving of belief.

Finally, we consider it necessary to comment on the government's witnesses. Melvin Grover, Clarence Jones and Sandra Jones are not exemplary citizens. All three have convictions resulting mainly from drug addiction. Grover and Jones undoubtedly expect favorable treatment from the government for their testimony even though the government has made no promises. Despite these factors, we were impressed with their testimony. It might have been easier in terms of their own personal safety for them not to cooperate with the government. Paraphrasing the way one defense witness put the matter: informers are not liked. Their demeanor conveyed a welcomed frankness and, we felt, a desire to tell the truth. This we think they have done.

### DISCUSSION

█ Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) held that the due process clause of the Fourteenth Amendment, and presumably the due process clause of the Fifth Amendment applicable to the United States Government, requires certain procedures before a final decision revoking parole can be made. The same procedures must also obtain before a final decision revoking probation is made. Gagnon v. Scarpelli, 411 U.S. 778, 93 S. Ct. 1756, 36 L.Ed.2d 656 (1973).

In analyzing the process involved in a parole revocation decision, the Court in *Morrissey* ascertained two distinct steps.

The first step in a revocation decision . . . involves a wholly retrospective factual question: whether the parolee has in fact acted in violation of one or more conditions of his parole. Only if it is determined that the parolee did violate the conditions does the second question arise: should the parolee be recommitted to prison

or should other steps be taken to protect society and improve chances of rehabilitation? The first step is relatively simple; the second is more complex. The second question involves the application of expertise by the parole authority in making a prediction as to the ability of individual to live in society without committing antisocial acts. This part of the decision, too, depends on facts, and therefore it is important for the board to know not only that some violation was committed but also to know accurately how many and how serious the violations were. Yet this second step, deciding what to do about the violation once it is identified, is not purely factual but also predictive and discretionary.

408 U.S. *supra* at 479–480. Recognition of this two-step approach requires a re-examination of the standard of proof utilized by courts in deciding whether to revoke probation.

A. STANDARD OF PROOF. The question of the quantum of evidence necessary to find that probation has been violated has often been articulated as that evidence which "reasonably satisfies" the trier of fact that the terms of probation have been violated. See United States v. D'Amato, 429 F.2d 1284, 1286 (3 Cir. 1970); United States v. Nagelberg, 413 F.2d 708 (2 Cir. 1969); Nelson v. United States, 225 F.2d 902, 904 (10 Cir. 1955).

A standard of proof requiring the trier of fact to simply determine whether the evidence presented at the probation revocation hearing "reasonably satisfies" him that a violation has occurred partakes of both a fact determining process and a discretionary or predictive process. In revoking probation pursuant to a reasonable satisfaction standard, it is not clear to what extent the evidence satisfies the conclusion reached or to what extent the trier of facts simply considers it best for the defendant that probation be revoked. The standard of reasonable satisfaction of a violation, even assuming it can be considered a standard of proof, does not compel the trier of fact to first view the evidence of a violation before determining what seems best for the probationer in the future.

█ The blurring of the fact finding function with the predictive function caused by the "reasonably satisfied" standard is incompatible with the due process procedures mandated by *Morrissey*. As the Court stated in *Morrissey*: "Only if it is determined that the parolee did violate the conditions does the second question arise: should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation?" 408 U.S. *supra*, at 479–480. The fact finder is required to first focus on the quality and the weight of the evidence presented before exercising its predictive function.

█ It is necessary therefore to consider the standard of proof required to find a violation of probation. Initially, we think it clear that the standard of proof should not be beyond a reasonable doubt. It is clear that probation revocation is not part of the criminal process. Gagnon v. Scarpelli, *supra*; Morrissey v. Brewer, *supra*. The purposes served by proof of guilt beyond a reasonable doubt do not obtain in a probation revocation hearing. See In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In a probation revocation hearing we do not need to give "concrete substance for the presumption of innocence—that bed rock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.' Coffin v. United States, [156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481] *supra*." In re Winship, 397 U.S. *supra*, at 363. Nor are we concerned with the loss of a person's liberty but only his conditional liberty. A probationer can never harbor any certainty that he will never be incarcerated during the term of his probation.

Nor do we believe that a clear and convincing evidence standard is required to evaluate the evidence presented at a pro-

bation revocation hearing. In Woodby v. Immigration Service, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966), the Court held that in deportation hearings the government's proof must present evidence which is clear and convincing as to the grounds for deportation. The Court noted the drastic deprivations attendant upon a finding of deportation. A person is compelled "to forsake all the bonds formed here and go to a foreign land where he often has no contemporary identification." Woodby v. Immigration Service, 385 U.S. *supra,* at 285. The order to deport may be visited on a person who has spent nearly his entire life in this country.

Without demeaning the "grievous loss" caused by probation revocation, we consider that such loss does not demand the proof required in a deportation proceeding. Certainly the expectation of conditioned presence in this country is more secure for an alien than is the expectation of continued freedom for a person on probation. Furthermore, the conditional liberty enjoyed by a probationer will usually have a definite terminal date. A probationer is not required by the government to remain his entire life in good stead with society at the risk of incarceration pursuant to procedures and standards less demanding than the ones governing those persons who enjoy unconditional liberty. The government's interest in preventing probation violations should therefore be given great weight.

These considerations lead us to conclude that a violation of the conditions of probation need only be proved by a preponderance of the evidence. This standard will provide the needed flexibility required in a probation revocation hearing. At the same time this standard will prevent revocation of probation based on hasty decisions as to the evidence presented; the revocation will have been based on facts reliably determined. Furthermore, we note that a preponderance of the evidence standard is recommended by the American Bar Association Report on Standards For Criminal Justice, Standards Relating to Probation § 5.4(a)(iii).

We consider the evidence in this case to have established the defendant's violation not only by the requisite preponderance of the evidence standard but also beyond a reasonable doubt. Having credited the testimony of the government witnesses, the evidence corroborating their testimony and all the other evidence in the record, we find that the defendant has violated the conditions of his probation by receiving stolen Treasury checks knowing them to be stolen.

It is necessary to discuss in particular one area of the evidence offered by the government—the voiceprint evidence.

B. VOICE PRINTS. The government evidence relating to voiceprint analysis consisted of the testimony of two expert witnesses, the known and unknown tape recordings and numerous spectrograms from which one of the experts drew the conclusion that the voice on the January 21, 1974, tape recording was the defendant's voice. Frederick Lundgren produced the spectrograms or graphic representations of sounds from the known tape of defendant's voice and the tape of the January 21 conversation. Lundgren's function was merely the mechanical reproduction of the sounds on the tapes to a graphic design. Lieutenant Ernest W. Nash, head of the Michigan State Police Voice Identification Unit, performed the actual evaluative function of examining and comparing the results of the known and unknown tape representations and rendering an opinion based on this evaluation.

Nash's qualifications as an expert examiner of spectograms have been noted by many courts that considered the use of opinion evidence resulting from voiceprint analysis. His work assisting Dr. Oscar Tosi, a professor at Michigan State University, and his current experience as head of the Michigan State Police Voice Identification Unit have been recounted before in other courts. There can be no doubt that Nash is qualified

to testify as to the reliability of spectogram analysis.

Nash testified that based on the spectrogram analysis he had done he was positive that the voice on the January 21, 1974, taped conversation was the same voice as that on a known taping of the defendant's voice. We must consider what evidentiary use may be made of this testimony.

The use of spectogram analysis in judicial proceedings has not had uniform acceptance. In determining whether spectrogram analysis should be utilized, courts have applied the standard of Frye v. United States, 54 App.D.C. 46, 293 F. 1013 (1923). In *Frye* the court rejected the use by a defendant in a criminal case of a polygraph analysis. The court held that the results of the polygraph were not admissible since it had not been established that polygraphs had gained general acceptance in the scientific community as a reliable indicator of the truthfulness of a person's statements.

The first civilian court to be confronted with the use of spectrogram analysis rejected its use based on the *Frye* test for admissibility. State v. Cary, 49 N.J. 343, 230 A.2d 384 (1967), on remand 99 N.J.Super. 323, 239 A.2d 680 (Law Div. 1968), remanded again, 53 N.J. 256, 250 A.2d 15 (1969), aff'd 56 N.J. 16, 264 A. 2d 209 (1970). At that time only the Air Force Board of Review had considered the issue and found spectrogram analysis admissible. United States v. Wright, C.M.R. (A.F.B.R.1966) aff'd 17 U.S.C.M.A. 183, 37 C.M.B. 447 (1967). Its use was also held inadmissible by the California Court of Appeal in People v. King, 266 Cal.App.2d 437, 72 Cal. Rptr. 478 (Dist.Ct.App.1968). Both the *Cary* and *King* courts noted that the contention for admissibility of spectrogram analysis was based on the sole authority of Mr. Lawrence Kersta. The adequacy of Kersta's scientific studies had been severely criticized by other experts.

Subsequent courts have noted the further research performed by a Dr. Oscar Tosi with the assistance of Lt. Nash. In these subsequent cases it has been noted that the scientific experiments performed by Dr. Tosi from 1968 to 1970 at Michigan State University have been favorably reviewed by other experts.

A series of court decisions have now held the use of spectrogram analysis admissible for various purposes in criminal proceedings. In State ex rel. Trimble v. Hedman, 291 Minn. 442, 192 N.W.2d 432 (1971), the court permitted the use of a spectrogram analysis in support of a finding of probable cause to arrest. In dictum the court stated that "in the trial of the case spectrograms ought to be admissible for the purpose of corroborating voice identification by aural means if a sufficient foundation is laid to satisfy the trial judge that the expert whose opinion is sought is qualified to assist the factfinder in coming to the right conclusion." 192 N.W.2d *supra*, at 441.

In United States v. Raymond, D.C., 337 F.Supp. 641 (1970), the court held that use of spectrogram analysis was admissible at trial to identify the defendant as the person who made a phone call to the police which led to an ambush of a policeman. The court noted that the major criticisms made of the Kersta experiments had been remedied by Dr. Tosi's studies. Two Florida appellate courts have also held admissible the use of spectogram analysis at trial in criminal cases. Worley v. State, 263 So.2d 613 (Fla.App.1972); Alea v. State, 265 So.2d 96 (Fla.App.1972).

The New Jersey Supreme Court has also noted the subsequent research done by Dr. Tosi and the acceptance the research has received from other experts. In State v. Andretta, 61 N.J. 544, 296 A.2d 644 (1972), the court held the spectrogram analysis sufficiently reliable to allow the government to compel a person to submit to a voice exemplar. Hodo v. Superior Court, 30 Cal.App.3d 778, 106 Cal.Rptr. 547 (1973), held spectrogram

analysis admissible in a criminal case in which the defendant was charged with receiving a bribe. And in United States v. Brown, 13 Crim.L.Rptr. 2203 (1973), the District of Columbia Superior Court held that spectrogram analysis had obtained general acceptance in the scientific community permitting its admissibility in a criminal case. See also Admissibility and Weight of Voiceprint or Sound Spectrograph Evidence, 49 A.L. R.3rd 915.

A dissenting opinion has been registered recently, however, by the Marin County Superior Court of California in People v. Chapter, 13 Crim.Law Rptr. 2479 (1973). The *Chapter* court noted that on the record before it there was not a general acceptance in the scientific community of the reliability of spectogram analysis. Experts who testified in the *Chapter* court disputed the existence of a general acceptance in the scientific community. The court also noted that the particular expert opinion given in that case was unreliable because there were errors in the preparation of the spectrograms.

■ ▉ The case before us is a probation revocation hearing; not a criminal proceeding. The government's burden is to establish by a preponderance of the evidence that grounds for revocation exist. We consider it sufficient for these purposes that the general rule of admissibility of opinion evidence be applied; testimony by a witness as to matters which are beyond the ken of the layman will be admissible if relevant and the witness is qualified to give an opinion as to the specialized area of knowledge. The *Frye* test of general acceptance in the scientific community precludes too much relevant evidence for purposes of the fact determining process at a revocation hearing. As one commentator has stated:

> "General scientific acceptance" is a proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence. Any relevant conclu-

sions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion. Particularly, probative value may be overborne by the familiar dangers of prejudicing or misleading the jury, and undue consumption of time. If the courts used this approach, instead of repeating a supposed requirement of "general acceptance" not elsewhere imposed, they would arrive at a practical way of utilizing the results of scientific advances.

McCormick on *Evidence* § 203 at 491 (2d ed. 1972). Under this rule of admissibility the party opposing consideration by the trier of fact of the expert's evidence would, of course, be entitled to produce contrary expert opinion evidence and argue as to the proper weight that should be given such evidence.

In the case before us we gave the expert's opinion of the identity of the voice on the January 21, 1974, tape recording such weight as to be corroborative of Grover's testimony that it was the defendant with whom he spoke on that day. We consider this evidence of such a quality and weight as to overcome the evidence by the defendant which may lead to an opposite conclusion.

Grover's testimony was that a young girl was present when Grover entered the defendant's house on January 21, 1974. The defendant contends the voice of this young girl on the tape recording could only have been that of his daughter, and that she was at a neighbor's house at that time. Only the defendant's testimony was offered in support of that conclusion. The defendant's evidence does not preclude the presence of a young girl at the defendant's house on January 21, 1974, while Grover was present.

▉ The defendant offered no evidence challenging the reliability of the voice print evidence. We have considered this evidence as corroboration of Grover's testimony. Based on Lt. Nash's testimony and the acceptance of

voice print evidence by other courts, we consider the technique sufficiently reliable for purposes of this hearing.

## CONCLUSION

We find based upon the evidence produced at the revocation of probation hearing that the government has established beyond a reasonable doubt that the defendant has violated the probation imposed upon him on March 19, 1973, by receiving stolen U. S. Treasury checks knowing them to be stolen even though the government need only have proven the charges by a preponderance of the evidence. We are satisfied that such finding warrants revocation of defendant's probation.[5],[6]

5. The defendant admitted at the hearing on probation revocation that he had been driving without a valid license. We did not consider this as a basis for revocation because the government did not give notice to defendant that driving without a valid license would be considered as one of the grounds for revocation of probation.

6. In its motion to revoke probation the government charged the defendant with "fencing" checks. The government also outlined the facts underpinning its charge that .the defendant "fenced" checks. These facts include both the possession of stolen Treasury checks knowing them to be stolen and the causing of the checks to be negotiated. The government's proof at the probation revocation hearing falls short of proving that defendant caused Treasury checks to be negotiated. We consider the notice given to the defendant in the government's motion to revoke probation sufficient, however, to apprise the defendant of the charge of possessing stolen Treasury checks knowing them to be stolen. On this charge the government has sustained its burden of proof.