**UNITED STATES of America**

v.

**Charles IANNECE.**

**Crim. No. 73–647.**

United States District Court,
E. D. Pennsylvania.

Sept. 15, 1975.

Donald F. Manno, Sp. Atty., Philadelphia Strike Force, Philadelphia, Pa., for the United States.

Joseph C. Santaguida, Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

Following an evidentiary hearing, the defendant was found guilty of violating his probation, it was revoked, he was sentenced to prison, and has now appealed. This opinion is being prepared to explain to the Court of Appeals the

findings and conclusions which led to my final judgment.

### I. *Factual Background*

On January 29, 1974, defendant, Charles Iannece, plead guilty to a charge of conspiracy to conduct an illegal gambling business in violation of 18 U.S.C.A. § 371 and 18 U.S.C.A. § 1955. At that time I imposed a suspended sentence, placed the defendant on probation for one year and ordered him to pay a fine of $1000. The terms of the probation included a requirement that Iannece refrain from any unlawful conduct. Subsequently the Government petitioned this court to revoke the defendant's probation on the grounds that he had violated one of its conditions by engaging in illegal gambling activities and an evidentiary hearing was held. The defendant was represented by counsel of his own choice throughout these proceedings.

At the hearing the Government introduced evidence which may be summarized as follows: Pursuant to a Title III authorization signed by the Honorable E. Mac Troutman of this court, a wire interception and pen register were maintained from November 11 through November 19, 1974, on telephone number 215–DE 6–4644, which is listed to Nancy Melilli, 425 Vollmer Street, Philadelphia, Pa. Special Agent Gerard J. Woltemate of the FBI, an experienced gambling investigator, testified that this telephone was being used to conduct a large gambling business which grossed from $10,000. to $40,000. per day. During the period of the interception approximately 50 calls were made from the intercepted number to telephone number 215–755–7607, located at 1133 Wolf Street, Philadelphia, the address at which Iannece resided. Tape recordings of eight of these calls (Exhibit 2) were played for the court and transcripts of these eight calls were introduced into evidence (Exhibits G3.1—G3.8).

Special Agent, Louis H. Vernazza identified the voice of "John" on the tapes as being that of John Mellili, and Special Agent John Glasgow identified the defendant by voice as being a participant in six of those calls. This same agent testified that during the execution of a search warrant at appellant's residence on December 10, 1974, appellant, after having been advised of his rights, stated that the agents "were too late . . . .. The Philadelphia Police Department had hit the operation at his mother's house about a week ago. The police took all his action." (N.T. 78).

Special Agent K. C. Rohr, who the parties stipulated to be an expert in the field of gambling, testified that the tapes and transcripts contained conversations in which wagering information was exchanged and bets were turned over to "John" [Mellili] by appellant. Rohr stated that the volume of bets turned over and the tenor of the conversations indicated that Iannece was not merely a bettor, but occupied a higher position in a numbers operation such as an office man, who receives bets from a number of different writers and forwards the total to a banker or controller. (N.T. 107–112, 120–121). Rohr also testified that the business relationship between Mellili and appellant was extremely close (N.T. 115), with Mellili occupying a position superior to appellant in the organization (N.T. 111, 114), but that appellant appeared to have a proprietary interest in the operation rather than being on salary (N.T. 116). Rohr concluded that Mellili and appellant were participants "at the very highest level in the hierarchy of a numbers gambling business here, as it exists in the City of Philadelphia." (N.T. 121).

Officer Robert Reid, an 18 year veteran of the Philadelphia Police Department and also a stipulated expert in gambling matters (N.T. 93–94), testified concerning the execution of a state search warrant at the residence of appellant's mother at 2201 South 21st Street, Philadelphia. Reid stated that appellant was observed leaving the residence immediately prior to the execution of the warrant, was stopped and

searched, and a "tally sheet" (Exhibit No. 5) containing approximately $9000. worth of gambling business was found in his sock. Officer Reid said that during the search of the house nine sheets of "rice paper" (Exhibit No. 6), commonly used by gamblers because it dissolves in water, were found. Five sheets contained 1400 "straight-box-numbered" (combination) bets and 27 horse bets totalling $1557., one sheet contained 225 sports bets totalling $36,-000., and three were tally sheets with 42 names totalling $26,000. (N.T. 95–99). The defendant offered no evidence.

At the close of the hearing I concluded that during the term of Iannece's probation he was conducting an illegal gambling business and specifically that he was accepting wagers, transmitting wagers, and receiving betting information, conduct which was in violation of the penal laws of Pennsylvania. (N.T. 134). I therefore revoked appellant's probation and on March 4, 1975, imposed a sentence of four years imprisonment with eligibility for parole after one year and eligibility for a work release program after six months. I also imposed a $1000. fine.

## II. *Discussion*

■ The decision to revoke probation lies within the sound discretion of the district court and it has been held that a district judge need only be *reasonably satisfied* that the probationer has violated the terms of his conditional release. *United States v. D'Amato*, 429 F.2d 1284, 1286 (3d Cir. 1970). See *United States v. Strada*, 503 F.2d 1081, 1085 (8th Cir. 1974); *United States v. Alarik*, 439 F.2d 1349, 1351 (8th Cir. 1971); *United States v. Nagelberg*, 413 F.2d 708, 709–10 (2d Cir.) cert denied, 396 U.S. 1010, 90 S.Ct. 569, 24 L.Ed.2d 502 (1970); *United States v. Cates*, 402 F.2d 473, 474 (4th Cir. 1968). In *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) the Supreme Court delineated the two-step process involved in a parole or probation revocation decision:

The first step in a revocation decision . . . . involves a wholly retrospective factual question: whether the parolee has in fact acted in violation of one or more conditions of his parole. Only if it is determined that the parolee did violate the conditions does the second question arise: should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation? The first step is relatively simple; the second is more complex. The second question involves the application of expertise by the parole authority in making a prediction as to the ability of the individual to live in society without committing antisocial acts. This part of the decision, too, depends on facts, and therefore it is important for the board to know not only that some violation was committed but also to know accurately how many and how serious the violations were. Yet this second step, deciding what to do about the violation once it is identified, is not purely factual but also predictive and discretionary.

408 U.S. at 479–80, 92 S.Ct. at 2599–2600.

■ My colleague, Judge Daniel H. Huyett, 3rd, recently pointed out in *United States v. Sample*, 378 F.Supp. 44 (E.D.Pa.1974), that the "reasonably satisfied" standard of *D'Amato,* supra, contains elements of both the fact determining function and the discretionary predictive function referred to in *Morrissey.* As such, the "reasonably satisfied" standard tends to blur the sharp distinction between these two processes drawn by the Supreme Court in *Morrissey* and to distract attention from the underlying question of what quantum of proof is required to prove a violation at a probation revocation hearing. I concur with Judge Huyett that a "reasonably satisfied" standard to establish probation violation would be incompatible with the due process requirements of *Morrissey.*

■ I also agree, for the reasons set forth in *Sample,* supra, at 50–51, that the appropriate standard for factual determinations in a probation revocation hearing is proof by a preponderance of the evidence.[1] Turning to the facts of the case at bar, the evidence that appellant had violated the conditions of probation was overwhelming. The Government met its burden of establishing the defendant's violation beyond a reasonable doubt, and most certainly by a preponderance of the evidence.

■ I have had the opportunity to read the defendant's brief prepared for the Court of Appeals. His first assertion of error is that my finding that he was conducting an "illegal gambling business" was clearly erroneous. This contention is based on the argument that I used the words, "illegal gambling business," as they are specially defined in 18 U.S.C. § 1955 and that there was no evidence that five or more persons participated in the gambling business in which defendant was involved as required by Section 1955(b)(1)(ii).

The short answer to this assertion is that I made no reference to Section 1955 or its definitions, directly, indirectly, by implication, or otherwise. Just prior to using the words, "illegal gambling business," I made the finding that "John Melilli was conducting a large scale numbers, sports betting and horse racing

gambling business, . . . that this business was an illegal business and that the defendant, Charles Iannece, assisted him in this business." (N.T. 134). Had I stopped at this point, there could be no contention that any reference to a Section 1955 "illegal gambling business" was intended. However, I went on to employ those words as a label to describe defendant's activities, but did so in the generic sense as is quite evident from my further specific findings that the defendant was accepting wagers, transmitting wagers, receiving betting information, and that this conduct violated the penal laws of Pennsylvania. (N.T. 134). Although I did not make a specific statutory reference, in Pennsylvania it is a crime to set up or maintain[2] any numbers game, 18 C.P.S.A. § 5512(b)(1), or to receive, record, or register bets, or to sell pools, 18 C.P.S.A. § 5514(2). The evidence plainly showed that Iannece received and was transmitting numbers bets,[3] received instructions as to bettors,[4] and was concerned with bets on football games.[5] Just as the "record . . . is devoid of facts establishing that Mr. Iannece conducted an 'illegal gambling business' [within the meaning of § 1955]," Brief for Appellant at 14, so also is the record devoid of anything that might reasonably have led appellant or his counsel to believe I intended the words "illegal gambling business" to refer to Section 1955.[6]

1. See also *Pickens v. Texas,* 497 F.2d 981, 982–83 (5th Cir.), cert. denied, 419 U.S. 880, 95 S.Ct. 145, 42 L.Ed.2d 120 (1974) (proof beyond reasonable doubt not required; revocation will not be upset on appeal save for clear showing of abuse of discretion); *United States v. Lauchli,* 427 F.2d 258, 260 (7th Cir.), cert. denied 400 U.S. 868, 91 S.Ct. 111, 27 L.Ed.2d 108 (1970) (proof beyond reasonable doubt not required for probation revocation).

2. In this sense, "maintain" means to carry on or to further a numbers game. See *Webster's New International Dictionary* (2nd ed., 1961).

3. Exhibits G3.1 and G3.4.

4. Iannece was told not to accept wagers from a certain individual from which I inferred that accepting bets was one of his activities. See Exhibit G3.2.

5. Exhibit G3.6 showed that Iannece discussed the betting point spread (i. e., "line") for certain football games. In view of his other

proven activities, I considered this to be circumstantial evidence from which I could and did conclude that he was involved in receiving bets on these games. (See also G3.5 and the explanation of Special Agent Rohr.)

6. In view of the absence of any reference to Section 1955 and the specific reference to the laws of Pennsylvania, I am not being Humpty-Dumptyish to insist that "illegal gambling business" was used generically. Cf. L. Carroll, Through the Looking Glass, 182:

"But 'glory' doesn't mean 'a nice knock-down argument'," Alice objected.

"When *I* use a word," Humpty Dumpty said in rather a scornful tone, "it means just what I choose it to mean—neither more nor less."

"The question is," said Alice, "whether you *can* make words mean so many different things."

"The question is," said Humpty Dumpty, "which is to be master—that's all."

■■ Although his brief is not entirely clear on the point, I believe appellant also asserts error grounded on the fact that my finding that he had violated the gambling laws of Pennsylvania was based on wiretap evidence which would have been inadmissible in state court [7] under Pennsylvania's invasion of privacy statutes. 18 P.S. §§ 5701–05. Since appellant did not raise this issue before me, I had no occasion to consider it prior to listening to the tapes and transcripts at the hearing. In any event, appellant's contention is without merit since "so long as the information was lawfully obtained under federal law and met federal standards of reasonableness,[8] it is admissible in federal court despite a violation of state law." *United States v. Armocida*, 515 F.2d 49, 51–52 (3d Cir. 1975). See *Elkins v. United States*, 364 U.S. 206, 223–24, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960); *United States v. Johnson*, 484 F.2d 165, 168 (9th Cir.), cert. denied, 414 U.S. 1112, 94 S.Ct. 842, 38 L.Ed.2d 739 (1973); *United States v. Romero*, 484 F.2d 1324, 1327 (10th Cir. 1973); *United States v. Copes*, 191 F.Supp. 623, 624–25 (D.Md.), aff'd sub nom *United States v. Sawyer*, 297 F.2d 535 (4th Cir.) cert. denied, 370 U.S. 946, 82 S. Ct. 1592, 8 L.Ed.2d 782 (1962).

■ Defendant's third argument [9] is that the doctrine of collateral estoppel precluded my considering the testimony of Officer Reid because this evidence had previously been offered during a state prosecution in which defendant was charged with gambling and was acquitted.

I disagree with the substance of defendant's assertions as to collateral estoppel for several reasons. Although this doctrine is encompassed within the double jeopardy clause of the fifth amendment, *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), and is applicable to the states via the fourteenth amendment, *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), the Supreme Court has expressly held that because dual sovereignties are involved in our federal system, prosecution by both the United States and a state for the same offense does not constitute double jeopardy. *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959);

7. Appellant did not seriously challenge the propriety under federal law of the wire interceptions, see note 8 infra, and has not raised this issue at all in his brief to the Court of Appeals.

8. At the hearing counsel for the defendant objected to the admission of the evidence obtained from the wire interceptions authorized by Judge Troutman. Counsel offered no particular reasons as to why this evidence should be excluded, but merely took the position that the Government had the burden of again establishing—this time to my satisfaction—that there was probable cause for the wire interceptions. (N.T. 39, 124). The evidence in question was obtained pursuant to a search warrant and therefore appellant had the burden of coming forward with evidence to establish a lack of probable cause for issuance of the warrant. *United States v. Various Gambling Devices*, 478 F.2d 1194, 1199 (5th Cir. 1973); *United States v. Wright*, 468 F.2d 1184, 1185–86 (6th Cir), cert. denied, 412 U.S. 938, 93 S.Ct. 2771, 37 L.Ed.2d 397, rehearing denied, 414 U.S. 881, 94 S.Ct. 36, 38 L.Ed.2d 129

(1972); *Chin Kay v. United States*, 311 F. 2d 317, 321 (9th Cir. 1962). Since counsel offered nothing in the way of evidence to suggest any inadequacies in the application for or authorization of the wire interceptions, I overruled his objection. See *United States v. D'Andrea*, 495 F.2d 1170, 1174 (3d Cir.), cert. denied, 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974); *United States v. Hickok*, 481 F.2d 377, 378–79 (9th Cir. 1973).

9. This argument was not made before me. Instead, at the conclusion of the hearing counsel contended that since no violation of federal law had been shown and since Iannece had been acquitted in state court of gambling charges stemming from the occurrence of October 23, 1974, described by Officer Reid, there was no basis for finding defendant had violated the conditions of probation. I rejected this contention since even if Officer Reid's testimony were excluded the other evidence presented at the hearing before me established beyond a reasonable doubt that Iannece had violated Pennsylvania law.

*United States v. Burke,* 495 F.2d 1226, 1235 (5th Cir.), cert. denied, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974).

> Every citizen of the United States is also a citizen of a State or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for infraction of the laws of either. The same act may be an offense or transgression of the laws of both . . . . That either or both may (if they see fit) punish such an offender cannot be doubted. Yet it cannot be truly averred that the offender has been twice punished for the same offense; but only that by one act he has committed two offenses, for each of which he is justly punishable. He could not plead the punishment by one in bar to a conviction by the other.

*Moore v. Illinois,* 55 U.S. (14 How.) 13, 20, 14 L.Ed. 306 (1852). *Ashe* is therefore not controlling in the present case.[10] Justice Frankfurter in *Bartkus* and Justice Brennan in *Abbate* explained that the interests sought to be fostered by federal and state proceedings stemming from the same conduct may be quite different and were the rule otherwise, the purposes of one sovereignty might be stifled by proceedings in the other.[11] See also *United States v. Feinberg,* 383

F.2d 60, 71 (2d Cir.) cert. denied, 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836 (1967) and cases cited therein; *United States v. Kills Plenty,* 466 F.2d 240, 247 (8th Cir.), cert. denied, 410 U.S. 916, 93 S.Ct. 971, 35 L.Ed.2d 278 (1973). The reasoning of *Bartkus* and *Abbate* is seminal to the case at bar because the interests of Pennsylvania and the United States were decidedly different. The state proceedings sought to. further at least two distinct objectives. The first was the concern of the citizens of Pennsylvania in having their gambling laws obeyed. The second was the fundamental requirement that no person be convicted of a criminal offense unless his guilt be proved beyond a reasonable doubt in a proceeding wherein he is afforded all of the rights guaranteed to an accused by the federal and state constitutions. On the other hand, the primary purpose of the United States in these proceedings is to promote the rehabilitation of a criminal by allowing him to integrate into and become a constructive member of society. *Morrissey,* 408 U.S. at 477–78, 92 S.Ct. at 2598. It was these reformation and rehabilitation objectives of probation policy that were sought to be furthered by the probation revocation proceeding. Cf. *United States v. Lauchli,* 427 F.2d 258 (7th Cir.) cert. denied, 400 U.S. 868, 91 S.Ct. 111, 27 L.Ed.2d 108 (1970).

10. *Ashe* requires a practical examination of the record of the prior proceeding to ascertain the particular matters that were determined. Appellant totally failed to meet his burden of coming forward with evidence as to what matters were concluded in the prior proceedings. See *United States v. International Building Co.,* 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182 (1953); *United States v. Feinberg,* 383 F.2d 60, 71 (2d Cir.) cert. denied, 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836 (1967); cf. *Hernandez v. United States,* 370 F.2d 171 (9th Cir. 1966).

Even if *Ashe* were applicable in the dual sovereignty situation the result in the instant case would not change because of the difference in the burden of proof between the criminal proceeding and the probation revocation proceeding. The burden of proof applicable to probation revocation proceedings is the same standard generally applicable in civil litigation and decisions are legion that acquit-

tal in a criminal proceeding does not bar subsequent civil litigation of the same issues. E. g. *One Lot Emerald Cut Stones and One Ring v. United States,* 409 U.S. 232, 235, 93 S.Ct. 489, 492, 34 L.Ed.2d 438 (1972); *United States v. National Ass'n of Real Estate Bds.,* 339 U.S. 485, 492–94, 70 S.Ct. 711, 716–17, 94 L.Ed. 1007 (1950); *Neaderland v. C. I. R.,* 424 F.2d 639, 642–43 (2d Cir.), cert. denied, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970).

11. Although some doubt has been expressed as to the continuing validity of the dual sovereignty concept in view of *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), see *United States v. Knight,* 509 F.2d 354, 360 (D.C.Cir. 1974), for the reasons stated in the text I find the rationale of *Bartkus* and *Abbate,* at least in the circumstances of the present case, to be persuasive.

The fact that in a proceeding to which the United States was not a party, before a different sovereign, seeking to further different interests and with a different burden of proof, Iannece may have been acquitted, therefore did not preclude my considering the testimony of Officer Reid. The soundness of this conclusion becomes even more apparent when it is remembered that "revocation of probation is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to [probation] [12] revocation." *Morrissey*, 408 U.S., at 480, 92 S.Ct. at 2600. Surely if the dual sovereignty concept would allow the use of Officer Reid's testimony in a subsequent prosecution of Mr. Iannece, it does not prohibit its use in the more informal probation revocation proceedings.

I draw further support for my conclusion from the cases which have refused to apply the exclusionary rule to probation revocation proceedings. In *United States v. Winsett*, 518 F.2d 51 (9th Cir. 1975) the Ninth Circuit noted the importance of considering all available evidence:

> Because violation of probation conditions may indicate that the probationer is not ready or is incapable of rehabilitation by integration into society, it is extremely important that all reliable evidence shedding light on the probationer's conduct be available during probation revocation proceedings.
>
> Consequently to apply the exclusionary rule to probation revocation hearings would tend to frustrate the remedial purposes of the probation system.

*Id.* at 55. See also *United States ex rel. Sperling v. Fitzpatrick*, 426 F.2d 1161, 1163–64 (2d Cir. 1970) ; *United States*

v. *Brown*, 488 F.2d 94, 95 (5th Cir. 1973) ; *United States v. Vandemark*, 522 F.2d 1019 (9th Cir. 1975) ; *United States v. Schipani*, 435 F.2d 26–28 (2d Cir.), cert. denied, 401 U.S. 983, 91 S. Ct. 1198, 28 L.Ed.2d 334 (1971) ; *United ed States v. Cates*, 402 F.2d 473, 474 (4th Cir. 1968). While the policies behind the exclusionary rule on the one hand and collateral estoppel and double jeopardy on the other are different, the rationale of *Winsett* supports the admissibility of Officer Reid's testimony since it was clearly probative as to whether defendant had violated the conditions of probation. On the basis of logic and policy I conclude that the doctrine of collateral estoppel should not bar evidence in probation hearings on the substantive issues involved.

Finally there is the Third Circuit's decision in *United States v. Chambers*, 429 F.2d 410 (3d Cir. 1970). Chambers was a federal probationer whose probation had been revoked following his arrest on state charges of which he was subsequently acquitted. The court stated:

> Ordinarily, probation may be revoked on the basis of conduct which falls short of criminal conduct, *Burns v. United States*, 287 U.S. 216, 53 S.Ct. 154, 77 L.Ed. 266 (1932). Even conceding that in this case the sole reason for the revocation order was the district court's finding that the appellant was in fact guilty of the state criminal offenses, the burden of proof was greater in the criminal trial . . . And even conceding that the district court would not have revoked probation if it had not been convinced of appellant's guilt beyond a reasonable doubt, the validity of the court's findings could in no way be affected by the *later* contrary findings of the state tribunal. See, e. g., *United States v. Markovich*, 348 F.2d 238 (2d Cir. 1965). (Emphasis added).

12. *Morrissey* involved parole revocation. In *Gagnon v. Scarpelli*, 411 U.S. 778, 782, 93 S.Ct. 1756, 1759–60, 36 L.Ed.2d 656, the Supreme Court held that the due process requirements of *Morrissey* apply as well to probation revocation.

429 F.2d at 411. The single pertinent [13] difference between *Chambers* and the instant case is that here the state acquittal occurred *prior* to the revocation of probation. The only arguable relevance of that difference would be that collateral estoppel precluded redetermination of that which had previously been decided. In view of what has already been said regarding the applicability of collateral estoppel in this case, however, that distinction is immaterial. I therefore find *Chambers* controlling.

Since I found the evidence of Iannece's probation violation overwhelming, and the need for some other form of rehabilitative direction obvious, I sentenced him to incarceration with work release and parole eligibility to follow. For the reasons already stated, I believe there was no error in these proceedings.

---

13. Although in reaching its decision the *Chambers* court placed some reliance on the fact that the revocation order was based in part on the district court's finding that the probationer was guilty of a violation not charged in the state proceedings, I do not find this to be a significant difference.