**In re The PEOPLE of the State of Colorado, Plaintiff,**

v.

**Victoria WILKERSON, Defendant.**

**No. 04SA362.**

Supreme Court of Colorado,
En Banc.

June 27, 2005.

Carol Chambers, District Attorney, Daniel D. Plattner, Deputy District Attorney, Centennial, for Plaintiff.

David S. Kaplan, Colorado State Public Defender, Justin Bogin, Deputy State Public Defender, Englewood, for Defendant.

Justice COATS delivered the Opinion of the Court.

Wilkerson, who is the defendant in a prosecution for attempted murder, petitioned for relief pursuant to C.A.R. 21, from a pre-trial order of the district court excluding testimony offered by her expert witness. The district court barred the witness from giving his opinion, pursuant to CRE 702, that it was more likely than not that Wilkerson shot the victim accidentally. This court issued its rule to show cause why the order should not be vacated, and the People responded. We conclude that the district court did not abuse its discretion in excluding the proffered opinion, and we therefore discharge the rule.

## I.

Victoria Wilkerson was charged with attempted first degree murder, first degree assault, menacing, conspiracy and attempt to commit aggravated robbery, and committing a crime of violence, for her involvement in events occurring on March 3, 2003. According to police reports, she shot the victim with a handgun during a physical melee involving no fewer than four people. Wilkerson later told the police that the handgun she was holding "came off safety," and when she pointed it at the victim, it fired on its own.

Wilkerson endorsed an expert witness in the field of ergonomics, or human factors, to testify about accidental shootings, and the People objected. At a hearing prior to trial, the witness testified that ergonomics is a scientific discipline that analyzes the design of "systems" to make them safer and more useable, and to avoid human error. In this case, the "system" about which he proposed to testify was a person holding a handgun.

The witness also testified about his qualifications to give an expert opinion in this field. He indicated that he had co-authored two articles based on ergonomic handgun design, handgun training, and deficiencies in handgun training. More specifically, the articles discussed issues relating to trigger design, trigger forces, safeties, grip design, and the impact on people using handguns of such things as stress and lack of prior handgun experience. He also testified that he had studied analyses of accidental shootings by police.

Although the witness indicated that he had actually test-fired the guns involved in the other cases in which he had testified, he did not have access to, or any other information about, the handgun used by Wilkerson in this case.[1] Similarly, the witness conceded that

---

1. In this original proceeding, we have not been provided with any information about the circum-

he had never tested Wilkerson for specific physical characteristics, such as her reaction time, strength, or hand size, even though he considered those factors important, and that his opinion was based instead entirely on what she had related to him about the weapon and the events. On cross-examination, the witness agreed that his opinion was dependent upon the truthfulness of Wilkerson's statements about her lack of training with handguns, the stressfulness of the situation, and her desire to protect her husband and keep the situation from getting out of hand.

Nevertheless, the witness offered his expert opinion that it was "more likely than not" that the shooting was accidental. In response to questioning, he indicated that by that opinion he meant there was more than a 50% probability that it was accidental. In arguing for the admissibility of this expert testimony, defense counsel characterized it as being an opinion that under the conditions described by the witness, an accidental shooting could happen 51% of the time. Counsel expressly asked the court to permit the witness to testify and give his opinion about what he thought happened in this case, but if the court decided not permit the witness to give his opinion regarding the guilt or innocence of the defendant then, in the alternative, it should permit "a defense that says that the best minds that study this sort of thing and study stress, and study systems and human factors and study handguns, and have written articles about this sort of thing say that, yes, accidental shootings can happen."

In its order, the district court characterized the proffer upon which it was ruling as an offer of expert opinion "that it is more likely than not that Ms. Wilkerson fired the semi-automatic weapon accidentally based on persons' physiological response to stress, tunnel vision response to stress and inexperience with weapons." The court specifically found that the witness was "eminently qualified in the general area of human factors/ergonomics," and that he had studied and presented papers concerning accidental shootings. With regard to the specific proffer, however, the court was critical of the lack of any extant body of literature or knowledge concerning standards of measurement and error rates. Noting particularly that the witness was relying almost exclusively on the statements of the defendant, and that there was no specific weapon in evidence from which characteristics like the configuration of the safety, or the trigger mechanism and pull pressure could be taken, the court denied the defense proffer.

The district court did not address the defendant's alternate request in its order, and the defendant has not presented us with any indication that she requested clarification or a broader ruling. In her petition, the defendant sought disapproval of the district court's ruling excluding the witness' expert opinion "based upon his training, experience and knowledge of the allegations in this case that the defendant accidentally fired a handgun," and nothing more.

## II.

In *People v. Shreck*, 22 P.3d 68, 78–79 (Colo.2001), we made clear that CRE 702 represents the appropriate standard for determining the admissibility of scientific evidence in this jurisdiction, and we held that the focus of the trial court's inquiry should be on the reliability and relevance of such evidence. We held that the trial court's inquiry should be broad in nature and consider the totality of the circumstances of each specific case. We emphasized that the factors mentioned by the Supreme Court cases or other courts in specific cases may or may not be pertinent to any particular CRE 702 inquiry; and in light of this liberal standard, the trial court should also apply its discretionary authority under CRE 403 to ensure that the probative value of the evidence is not substantially outweighed by unfair prejudice.

Even though a general area of scientific knowledge is determined to be reliable, if the results of a scientific test or

stances of the shooting or arrest of the defendant, nor any explanation why the defense expert did not have access to the weapon or even know the make and model of weapon that was actually used.

comparison are not self-evident, the test itself lacks relevance unless there is also reliable expert interpretation of its results. *People v. Lee,* 18 P.3d 192, 197 (Colo.2001); *see also Fishback v. People,* 851 P.2d 884, 893 (Colo.1993). In *Fishback,* we held that the method used to calculate the probability of a random match between DNA recovered from a crime scene and that of the defendant was also subject to the general acceptance test, just as the underlying scientific methods used for DNA profiling. *Id.* at 893. Although *Shreck* later replaced the *Frye* [2] general acceptance test with the CRE 702 analysis, *Shreck,* 22 P.3d at 77, it nevertheless remains true that "a declared [DNA] match, unaccompanied by its statistical significance, is essentially meaningless," *Fishback,* 851 P.2d at 893 n. 18. Even where the underlying scientific evidence would be sufficiently reliable under a CRE 702 analysis, that in no way demonstrates the reliability of the method of reaching statistical or numerical conclusions related to the underlying evidence. A CRE 702 analysis is independently necessary to show that statistical or numerical results are also relevant and reliable. *See Lee,* 18 P.3d at 197 (citing *Fishback,* 851 P.2d at 893 & n. 18); *see also Shreck,* 22 P.3d at 76–78.

## III.

■ Understood as narrowly as it was by the district court, the defendant's proffered expert opinion was virtually without any support in the record whatsoever, much less support sufficient to demonstrate the reliability of a numeric calculation of the probability that the shooting in this case was accidental. Although the witness may have intended nothing more than an expression of personal confidence (based on his experience studying handgun usage) that this particular shooting was probably an accident, by expressing his expert opinion as a numerical conclusion, he could only be understood as offering a scientifically quantifiable probability statement about the likelihood of a particular occurrence.

An expert opinion that a shooting was probably accidental necessarily implies that it also was probably not purposeful, or inten-

tional. To the extent that it could be understood as an opinion directly about the defendant's state of mind, it was clearly beyond the scope of ergonomics, and the defendant's witness did not purport to have any expertise concerning the defendant's psychological condition or will. To the extent that it could be understood as an opinion based on circumstantial evidence of the shooting, or even a hypothetical opinion based on circumstances and conditions similar to those described by the defendant, such a numeric probability statement was nevertheless completely without empirical or methodological justification in the record.

Given the specific terms in which the opinion was offered in this case, and especially the danger that the expert would be understood simply as vouching for the defendant's account of events, it would be difficult to find an abuse of discretion in rejecting such an opinion as more confusing, or even misleading, than helpful. *See* CRE 403. In any event, however, the defense offered no foundation for a quantification of the likelihood that a shooting occurred, or would occur, accidentally, even in the absence of any intent by the shooter.

Until cross-examination, the witness made no attempt to quantify the probability that the shooting was accidental and apparently had no mathematical or scientific technique in mind. While he testified about ergonomic research into shootings, conducted in apparent attempts to discover the extent to which accidental shootings occur and to isolate contributing factors and hopefully eliminate them and avoid accidental shootings altogether, the witness never referenced a scientific methodology for quantifying, or a standard for measuring, the likelihood that a particular shooting was accidental, much less error rates for such testing. To the extent that he suggested the existence of measurement techniques at all, he referred to measurements like reaction time, strength, hand size, safety configuration, and trigger pull pressure, which he admittedly failed to make in this case, instead relying on less measurable factors like stressfulness and lack of experi-

**2.** *Frye v. United States,* 293 F. 1013 (D.C.Cir.   1923).

ence. In perhaps his only reference to a quantifiable factor, the witness presumed that the weapon used was a ".22 or .23 caliber semiautomatic," with a relatively light trigger pull, despite all indications from the police reports that a .38 caliber shell casing was found at the scene of the shooting.

Given the preciseness of the district court's order, rejecting an expert conclusion expressed in terms of quantifiable, scientific test results, the court's emphasis on the expert's failure to test a specific weapon and the absence of peer reviewed literature concerning standards for measurement and error rates did not evidence a misunderstanding of the flexible test we described in *Shreck*. Rather than excluding expert opinion merely because it was incapable of quantification, the district court was faced with an opinion expressed in numeric terms, and it appears to have considered precisely those factors most applicable to the admissibility of such a numeric test result.

Although the district court did not address defense counsel's alternate request to permit testimony concerning factors relevant to the question of accidental shootings generally, it specifically found the witness to be eminently qualified in the general area of human factors/ergonomics and did not exclude as unreliable all testimony concerning application of that field to accidental shootings. In light of the district court's failure to address more than the specific opinion that it was more likely than not that the shooting in this case was accidental, we offer no opinion concerning the reliability or relevance of any other proffered testimony of the defense expert.

## IV.

In light of the defendant's specific proffer and the district court's narrow holding, we find that the district court did not abuse its discretion in excluding the expert's proffered opinion that it was more likely than not that

the defendant shot the victim accidentally. We therefore discharge our rule.

Justice BENDER dissents, and Justice MARTINEZ joins in the dissent.

Justice BENDER, dissenting.

The majority holds that the trial court did not abuse its discretion in excluding the proffered testimony of an expert scientific witness. In *People v. Shreck*, 22 P.3d 68, 70 (Colo.2001), this Court held that CRE 702 controls a trial court's determination of the admissibility of expert scientific testimony and established three factors that a court must consider in assessing the "reliability and relevance" of the evidence. We expressly held that the nature of the trial court's admissibility inquiry should be "broad" and "liberal." *Id.*

Here, the proffered expert testimony concerns an application of the science of ergonomics, or the study of human factors, to accidental shootings. Based upon the record, I believe the proffered expert testimony was both reliable and relevant under CRE 702's liberal admissibility standard. Hence, I disagree with the majority's conclusion that this evidence was inadmissible. In my view, the majority errs not only by mischaracterizing the nature of the proffered expert opinion—that it was "more likely than not" that the shooting was accidental—as one expressing a numerical calculation of mathematical probability, but also, and perhaps more significantly, by departing from our holding in *Shreck* by applying a highly restrictive mathematical standard for admissibility. Because the expert here used the terms "likelihood" and "likely probability" to express his opinion as to the probability that the shooting was accidental in nature, the majority requires "support sufficient to demonstrate the reliability of a numeric calculation of the probability that the shooting ... was accidental." Maj. op. at 877. This holding posits the requirement that any proffered expert opinion testimony must be supported by mathematical probability theory, or the doctrine of chances,[1] in order to be deemed reliable.

---

1. Probability theory is the mathematical study, or analysis, of probability. This theory was published in 1733 in Abraham de Moivre's book entitled "The Doctrine of Chances." The "doctrine of chances" and "probability theory" have since

become synonymous. The theory of probability "attempts to *quantify* the notion of probable" (emphasis added). *See* http://www.nation master.com/ encyclopedia/ Probability;

Such a result contravenes the liberal standard for admissibility of expert opinion testimony under CRE 702.

In addition, I conclude, contrary to the majority, that the trial court excluded any and all testimony by this expert and did not just prohibit the expert's specific opinion regarding the accidental nature of the particular shooting in this case. *See* maj. op. at 878.

Hence, I respectfully dissent and would make the rule absolute and require the trial court to vacate its order excluding the proffered expert testimony.

## Discussion

At the pretrial hearing concerning the prosecution's motion to prohibit the trial testimony of Dr. Hal W. Hendrick, defense counsel sought to have Dr. Hendrick testify as an expert in the field of human factors/ergonomics. Dr. Hendrick testified that ergonomics involves "a scientific discipline that studies the capabilities and limitations of the characteristics of people, [and] converts that information into design specifications, guidelines, methods and tools to use in evaluating systems." The apparent theory of defense was that the defendant had accidentally fired the gun, and defense counsel offered Dr. Hendrick as an expert to give opinion testimony, based on his expertise in human factors/ergonomics, as to whether the shooting could have been accidental. The prosecution conceded that Dr. Hendrick was qualified to testify as an expert in this field.

Dr. Hendrick testified that, in his opinion, "there is a likely probability that this could have been an accidental shooting." He stated that the "reasons underlying" this opinion consisted of: (1) the "highly stressful nature" of the incident; (2) data concerning how people, in general, perform under stress; (3) the general characteristics of semiautomatic handguns; (4) the startle effect associated with a second fire; and (5) the defendant's lack of experience with handguns. When

questioned regarding his level of certainty that the shooting was accidental, Dr. Hendrick stated: "I cannot say for certain obviously that it was or was not, but certainly [it] is a real likelihood." In response to the question as to whether "likely" means "more than 50 percent," Dr. Hendrick agreed and confirmed that it was "[m]ore likely than not" that the shooting was accidental.

The trial court has broad discretion to determine the admissibility of expert testimony pursuant to CRE 702.[2] This discretion, however, is not without bounds. The trial court's admissibility ruling concerning expert testimony can be overturned if that ruling was "manifestly erroneous" and, thus, an abuse of the trial court's discretion. *See Masters v. People*, 58 P.3d 979, 988 (Colo. 2002); *People v. Fasy*, 829 P.2d 1314, 1317–18 (Colo.1992); *see also White v. People*, 175 Colo. 119, 123, 486 P.2d 4, 6 (1971).

In *People v. Shreck*, we redefined the standard for Colorado courts to apply in determining whether to admit scientific evidence or expert testimony related thereto. 22 P.3d at 78–79. While we had previously applied the "general acceptance test" of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), *superseded by statute/rule*, we explicitly disapproved of this test in *Shreck* because it "*restricts* the admissibility of reliable evidence that may not yet qualify as 'generally accepted.'" *Shreck*, 22 P.3d at 76 (emphasis added). We held that the standard for admissibility should instead be governed by CRE 702 and CRE 403 because "their flexibility is consistent with a liberal approach" to the admissibility of scientific evidence. *Id.* at 77.

We described this new standard of admissibility as an inquiry that should be "broad" and "liberal" with consideration given to the totality of the circumstances specific to each case. *Id.* at 77–79. Under CRE 702, proffered scientific evidence which is both "reliable and relevant" should be admitted. *Id.*

http://www.nation master.com/ encyclopedia/ Doctrine-of-Chances.

2. CRE 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

at 77. Scientific evidence is admissible when: "(1) the scientific principles at issue are reasonably reliable, (2) the witness is qualified to opine on such principles, and (3) the testimony will be useful to the jury." *Id.* at 79.

The majority concludes that the expert testimony here was inadmissible because there was no record support to establish the reliability of his "numeric calculation of the probability that the shooting ... was accidental." Maj. op. at 877. The majority states that Dr. Hendrick's "numeric probability statement was ... completely without empirical or.methodological justification in the record." *Id.* at 877. However, Dr. Hendrick did not offer an opinion which could reasonably be construed as representing a mathematical calculation of probability. The majority, itself, even recognizes that "[u]ntil cross-examination, [Dr. Hendrick] made no attempt to quantify the probability ... and apparently had no mathematical or scientific technique in mind." *Id.* at 877. In characterizing Dr. Hendrick's opinion as a "numerical conclusion," the majority, in my view, misconstrues the nature of Dr. Hendrick's testimony. He described the probability that the shooting was accidental as being a "likely probability," a "real likelihood," and "more likely than not." These statements do not represent a "numeric calculation" of the probability that the shooting was accidental.

Dr. Hendrick never indicated that he had calculated the exact mathematical probability that the shooting was accidental. Instead, according to his testimony, the "reasons underlying" his ultimate conclusion, *i.e.,* the stress element, the startle effect, the defendant's inexperience with handguns, etc., were all qualitative, as opposed to quantitative, factors and, thus, not empirical data from which a numeric calculation of probability could ever be made. *See Masters,* 58 P.3d at 989 (internal citation omitted) ("Because social science attempts to understand highly complex behavior patterns, it is necessarily inexact. However[,] this does not make [expert testimony concerning such subject area] per se inadmissible."). Dr. Hendrick testi-

fied that his conclusions were based upon "[s]ystematic observation" and not "quantitative statistical results."

The majority thus errs in misconstruing Dr. Hendrick's opinion as one embodying a numerical calculation. However, even if the opinion could be considered a "quantifiable probability statement," maj. op. at 877, the majority departs from *Shreck* in requiring, as a prerequisite for the admission of the proffered testimony, that the expert base his opinion, grounded in his discipline, upon mathematical probability theory. *See* maj. op. at 877 (indicating that there should be: (1) "support sufficient to demonstrate the reliability of a numeric calculation of the probability;" (2) "empirical or methodological justification;" (3) a "scientific methodology for quantifying;" (4) a "standard for measuring;" and/or (5) "error rates for such testing"). As noted, *Shreck* promotes a "liberal" and "broad" standard for admissibility. Requiring a trial court to evaluate the empirical data supporting such a theory turns the *Shreck* standard on its head by imposing a highly restrictive and rigid approach to admissibility determinations.

The majority finds support for its probability analysis in the cases of *People v. Lee,* 18 P.3d 192 (Colo.2001), and *Fishback v. People,* 851 P.2d 884 (Colo.1993), *abrogated in part* by *Shreck,* to state that a trial court must adjudge the reliability of the "method of reaching [the] statistical or numerical conclusions." Maj. op. at 877. These cases, however, are inapposite to the admissibility inquiry here. Both *Lee* and *Fishback* involved the admissibility of DNA evidence and thus directly concerned the statistical significance of the declared DNA profile "match." *See Fishback,* 851 P.2d at 888 ("Once a match has been declared, its statistical significance must be determined."). Unlike the evidence at issue here, the DNA evidence in *Lee* and *Fishback* was offered with the purpose of showing the mathematical "probability of a random match between the DNA profile derived from the crime scene and the profile derived from the suspect." [3] *Id.* at 893; *see*

---

3. Because the mathematical probability of a "match" was at issue in *Fishback,* it was necessary for the court there, unlike here, to address

the "error rates" of the probability calculations: "[T]he probability of a random match may be in error by two or more orders of magnitude (*i.e.,* 1

*also Lee*, 18 P.3d at 194. It was therefore the mathematical exactness and certainty of the proffered evidence which was at issue in *Lee* and *Fishback* and which thus led our Court to require a reliability determination of the statistical methods used. The probability calculations in these cases was both essential and integral to the determination of the reliability of the scientific evidence as a whole.

Here, however, in using the terms "likely" and "real likelihood"—terms which are inherently non-quantifiable—Dr. Hendrick offered an opinion which was in no way numerically or quantitatively based. To convert, as the majority does, a general opinion of the probability of a given scenario into one of mathematical probability theory merely because a witness uses certain "magic words," *i.e.*, "likely" or "probability," in expressing his or her opinion, will necessarily restrict the admissibility of any evidence concerning an expert witness's general opinion as to the probability of an outcome or result. By applying the statistical-method-based reliability determination test of *Lee* and *Fishback* to the opinion evidence here, the majority adopts a standard for admissibility which is not only highly restrictive in its empirical focus but is incompatible with the qualitative nature of the discipline and opinion proffered in this case and, undoubtedly, many others.

Contrary to the majority's conclusion, I would find that Dr. Hendrick's proposed opinions are both reliable and relevant and, thus, admissible under *Shreck*. First, as the prosecution conceded, Dr. Hendrick is sufficiently qualified as an expert to testify on matters concerning human factors/ergonomics. As the trial court stated, "Dr. Hendrick is eminently qualified" in this field. Second, because the predominant issue at trial would likely concern whether the defendant had accidentally fired the gun, Dr. Hendrick's expertise in human factors/ergonomics could be helpful to the jury because, according to Dr. Hendrick, "[k]nowledge about human factors aspects of handgun design, [and] knowledge about human performance under stress ... are not common things that a lay person typically would know or be expected

to know." Because it would thus not necessarily be within the common knowledge of the jurors as to the effect of human factors on the nature of a shooting in general and of the particular shooting in this case, Dr. Hendrick's proposed testimony could be considered helpful to the jury. *See Masters*, 58 P.3d at 989–90.

The admissibility of this expert testimony depends upon whether the scientific principles upon which the testimony is based are reasonably reliable. According to the detailed testimony of Dr. Hendrick, the science of human factors/ergonomics is an accepted and well-established discipline and, therefore, a field whose scientific principles may be presumed to be thoroughly tested and thus reasonably reliable.

Dr. Hendrick stated that human factors/ergonomics has been a "formally recognized discipline" since 1945; that the United States military has offered training in the subject and has relied on this science for military purposes since World War II; that there are several associations, or organizations, specific to the field, namely: the Human Factors and Ergonomics Society, the International Ergonomics Association, and the American Psychological Association; that sixty to seventy American universities offer advanced degrees or specialized tracks in the field; that there are a number of specialized publications in the field, including, but not limited to: the *Human Factors and Ergonomics Society Journal*, the *International Journal of Ergonomics*, *Theoretical Issues in Ergonomic Science*, and *Applied Ergonomics*. Further, while the trial court found, based upon Dr. Hendrick's testimony, that "there is a lack of peer-reviewed literature on this subject," my review of the record reveals that Dr. Hendrick testified that the theories of human factors/ergonomics are subject to a "very rigorous peer review system" and that he personally has reviewed more than 200 articles on handguns and accidental shootings.

Based on the accepted and established nature of human factors/ergonomics, and on Dr. Hendrick's particular qualifications in the field, I conclude that there was ample evi-

in 830,000,000 may actually be 1 in 8,300,000)."

851 P.2d at 894 n. 19.

dence indicating the reliability of the proffered testimony. *See Masters*, 58 P.3d at 988–89 (concluding that proposed testimony of psychologist was admissible where witness's qualifications to offer expert testimony were not disputed, and, in determining the reliability of the scientific principles underlying the proffered testimony, the court noted that the witness had been qualified as an expert multiple times in the past, and the field about which the witness would testify had been studied for over 100 years, was "generally accepted," and had an "extensive body of specialized literature" associated with it). Given this record, I conclude that the trial court committed manifest error, and thus abused its discretion, when it prohibited Dr. Hendrick from testifying.

I also note that the trial court erred in basing its admissibility determination in part on the fact that "there [was] no specific weapon in evidence from which characteristics could be taken [by Dr. Hendrick]." Whether Dr. Hendrick failed to analyze the gun used by the defendant to reach his opinion that the shooting may have been accidental is a fact which goes to the weight to be given his opinion by the jury and not to the admissibility of that opinion in the first instance. Weight and credibility determinations are for the jury to make, *People v. Nunez*, 841 P.2d 261, 265 (Colo.1992), and are thus not appropriate for consideration by the trial court to determine admissibility. *See Masters*, 58 P.3d at 993 (citing *People v. Viduya*, 703 P.2d 1281, 1291 (Colo.1985), and stating that "the weight to be given an expert's opinion is for the jury to resolve").

Finally, I disagree with the majority's characterization of the trial court's ruling on the prosecution's motion to exclude Dr. Hendrick's testimony. The majority states that the trial court "did not exclude as unreliable all testimony concerning application of [the field of human factors/ergonomics] to accidental shootings," maj. op. at 877, but, instead, barred only Dr. Hendrick's "specific opinion that it was more likely than not that the shooting in this case was accidental." *Id.*

To reach this conclusion, I believe the majority misreads both the trial court's order and the record of the pretrial hearing concerning this proffered testimony. In its written order, the trial court stated: "[T]he court agrees with the prosecution that *the testimony of Dr. Hendrick should not be allowed* in this case ..." (emphasis added). As can be seen from the court's plain language, the court barred any testimony of Dr. Hendrick and in no way limited, or otherwise qualified, its bar. The prosecution, in its motion in limine, sought to exclude Dr. Hendrick's testimony in its entirety—it asked that the court "deny the endorsement of this doctor and strike the witness's testimony as an expert with respect to this case." The trial court reaffirmed the prosecution's position when, in its written ruling, the court stated that it "agree[d] with the prosecution." It is accurate to say, as the majority does, that the trial court described the "nature of the proffered opinion" as whether "it is more likely than not that Ms. Wilkerson fired ... accidentally;" however, the majority errs by focusing on this statement as the basis to narrow the trial court's broad prohibition preventing Dr. Hendrick from testifying. Given the context of the full court order, as well as the position the prosecution took before the court, the trial court's last sentence—that "the People's motion to *exclude the opinion evidence of Dr. Hendrick* in this case is granted" (emphasis added)—compels the conclusion that this expert's testimony, in its entirety, was prohibited.

Because I believe the trial court abused its discretion in barring Dr. Hendrick's proffered testimony, I respectfully dissent and would make the rule absolute and require the trial court to vacate its erroneous order.

I am authorized to state that Justice MARTINEZ joins in this dissent.